JUSTICE SHEA
delivered the Opinion of the Court.
¶1 Timothy C. Martin appeals from the order of the Thirteenth Judicial District Court, Yellowstone County, denying his motion for judgment as a matter of law,[1] and his motion for a new trial. We affirm in part, reverse in part, and remand for a new trial consistent with this opinion.
¶2 The issues on appeal are as follows:

1. Whether the District Court erred by allowing Martin’s Locomotive Inspection Act claim to be considered by the jury.

*425
2. Whether the District Court abused its discretion by excluding evidence of heated platforms at BNSF’s Whitefish and Essex depots.

3. Whether the District Court abused its discretion by admitting into evidence the specific amount of income Martin made from his non-railroad employment.

PROCEDURAL AND FACTUAL BACKGROUND
¶3 Martin began working as a switchman/brakeman for BNSF on July 12,2004. A few months later, Martin was promoted to conductor after completing the required training and exam. In December 2008, Martin was permanently assigned to work on the conductors’ extra board in Whitefish. The extra board is a list of conductors who fill in on an as-needed basis for absent workers. Conductors on the extra board are guaranteed a daily rate of pay for remaining on the extra board and are paid a higher rate for actual trips made. On January 1,2009, the guaranteed daily rate for conductors on the Whitefish extra board was $199.86; the trip rate was $364.98.
¶4 On January 1,2009, Martin was called into work at 1:05 a.m. at BNSF’s Whitefish yard to work a priority z-train to Havre. At the yard, Martin met up with his co-worker, locomotive engineer Randy Anderson. After completing the required pre-trip paperwork, Martin and Anderson walked across the platform from the crew shanty to the train. Anderson boarded the locomotive before Martin. Before stepping onto the locomotive, Martin observed a small amount of ice and snow on the locomotive steps. As Martin climbed the steps of the locomotive, his foot slipped. Martin asserts that as he fell back towards the platform, his left foot came down on a berm of snow which had accumulated between the platform and the locomotive steps, causing his knee to twist and resulting in a tear of his left anterior cruciate ligament (ACL). Martin’s injury required surgery and physical therapy and prevented performance of his duties as a conductor between January 19,2009, and June 15,2009.
¶5 Before working for BNSF, Martin worked in law enforcement. Martin’s law enforcement experience included working as a sheriffs deputy in Roosevelt County and in undercover drug investigations in Yellowstone County. Martin has a master’s degree in criminal justice administration. From 2006 until 2010, Martin performed law enforcement related consulting work for the Chippewa-Cree Tribe.
¶6 Martin filed suit against BNSF on December 8,2011, under the Federal Employers’ liability Act (FELA), 45 U.S.C. § 51 et seq., alleging negligence. The juiy returned a verdict in favor of BNSF on *426 negligence and strict liability claims for violations of the Locomotive Inspection Act (LIA), 49 U.S.C. § 20701. On November 20, 2013, Martin filed a motion for judgment as a matter of law under M. R. Civ. P. 50, and, in the alternative, a motion for a new trial pursuant to M. R. Civ. P. 59. On January 31, 2014, the District Court filed an order denying Martin’s motion.
¶7 Martin appeals the judgment of the District Court.
STANDARDS OF REVIEW
¶8 We review de novo a district court’s grant or denial of a motion for judgment as a matter of law. When reviewing the grant or denial of a motion for judgment as a matter of law, we apply the same standards as the district court. Weber v. BNSF Ry. Co., 2011 MT 223, ¶ 16, 362 Mont. 53, 261 P.3d 984. Judgment as a matter of law is properly granted only when there is a complete absence of any evidence which would justify submitting an issue to a jury. All such evidence, and any legitimate inferences that might be drawn from the evidence, must be considered in the light most favorable to the party opposing the motion. Weber, ¶ 16 (citing Johnson v. Costco Wholesale, 2007 MT 43, ¶ 13, 336 Mont. 105, 152 P.3d 727).
¶9 The standard of review for discretionary trial court rulings is abuse of discretion. This standard may be applied to post-trial motions, such as motions for a new trial made pursuant to M. R. Civ. P. 59. In re Johnson, 2011 MT 255, ¶ 12, 362 Mont. 236, 262 P.3d 1105.
¶10 “This Court reviews evidentiary rulings for an abuse of discretion. A trial court has broad discretion to determine whether evidence is relevant and admissible. Absent a showing of an abuse of discretion, the trial court’s determination will not be overturned.” Mickelson v. Mont. Rail Link, Inc., 2000 MT 111, ¶ 35,299 Mont. 348,999 P.2d 985. A district court commits an abuse of discretion when it acts arbitrarily without conscientious judgment or exceeds the bounds of reason. If we determine that a district court abused its discretion, we must next determine whether the abuse of discretion constitutes reversible error. No reversible error occurs unless a substantial right of the appellant is affected, nor does reversible error occur unless the evidence in question was of such character as to have affected the outcome of the trial. United Tool Rental, Inc. v. Riverside Contr., Inc., 2011 MT 213, ¶ 10, 361 Mont. 493, 260 P.3d 156.
DISCUSSION
¶11 1. Whether the District Court erred by allowing Martin’s Locomotive Inspection Act claim to be considered by the jury. *427 ¶12 The FELA “renders railroads liable for employees’ injuries or deaths ‘resulting in whole or in part from [carrier] negligence.’ ” CSX Transp., Inc. v. McBride,_U.S._, 131 S. Ct. 2630, 2634 (2011) (quoting 45 U.S.C. § 51). Coupled with the FELA are numerous safety acts, including the LIA (previously the Boiler Inspection Act), and the Safety Appliance Act. Urie v. Thompson, 337 U.S. 163, 189-90, 69 S. Ct. 1018, 1034 (1949). The safety acts do not operate as a separate cause of action themselves, but “supplement^ the Federal Employers’ Liability Act by imposing on interstate railroads ‘an absolute and continuing duty* to provide safe equipment.” Urie, 337 U.S. at 188, 69 S. Ct. at 1034 (citing Lilly v. Grand Trunk W. R.R. Co., 317 U.S. 481, 485, 63 S. Ct. 347, 351 (1943)). Thus, injured railroad employees may seek recovery under the FELA for violations of these safety acts. Weber, ¶ 20 (citing Dallas v. Burlington N., Inc., 212 Mont. 514, 520, 689 P.2d 273, 276 (1984)). A railroad may breach its duty under the LIAnot only by violating the statute itself, 49 U.S.C. § 20701(1), but also by failing to comply with pertinent Federal Railroad Administration (FRA) regulations. McGinn v. Burlington N. R.R. Co., 102 F.3d 295, 299 (7th Cir. 1996). An FRA defect may constitute a violation of the LIA, thus giving rise to strict liability under the LIA.
¶13 To prevail on an LIA claim, a railroad employee must demonstrate both that the LIA has been violated and that the violation caused the employee’s injuries. Weber, ¶ 22. The employee’s burden of proof differs in a FELA case when the claim is premised on a violation of the LIA or an applicable regulation. The FELA requires a showing of negligence, whereas the LIA requires proof of a statutory or regulatory violation. Weber, ¶ 22.
When a plaintiff alleges that a railroad has violated a federal safety statute, the Supreme Court has ‘extended the reach of the principle of negligence per se to cover injuries suffered by employees as a result of their employers’ statutory violations, even if the injuries sustained were not of a type that the relevant statute sought to prevent.’
Weber, ¶ 22 (citing Consol. Rail Corp. v. Gottshall, 512 U.S. 532, 543, 114 S. Ct. 2396, 2404 (1994)). If the employee establishes a violation of the LIA, the negligence requirement of the FELA claim is established as a matter of law. Weber, ¶ 22.
¶14 “The LIA should be liberally construed’ in light of its primary purpose to protect employees and require the use of safe equipment.” Weber, ¶ 21 (citing Lilly, 317 U.S. at 486, 63 S. Ct. at 351). The LIA states in pertinent part that “[a] railroad carrier may use or allow to *428 be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances... are in proper condition and safe to operate without unnecessaxy danger of personal injury.” 49 U.S.C. § 20701(1). The applicable safety regulation at issue in this case requires that “[flloors of cabs, passageways, and compartments shall be kept free from oil, water, waste or any obstruction that creates a slipping, tripping or fire hazard.” 49 C.F.R. § 229.119(c).
¶15 Martin argues that because he proved the presence of ice and snow on the steps of the BNSF locomotive, which he argues is a slipping hazard and a violation of 49 C.F.R. § 229.119(c), BNSF is liable under the LIA as a matter of law. BNSF argues that whether ice and snow was a violation of 49 C.F.R. § 229.119(c) was a proper question for the jury, citing Gregory v. Mo. Pac. R.R., 32 F.3d 160 (5th Cir. 1994). In Gregory, there was conflicting testimony regarding the presence and amount of oil on a locomotive floor. The Fifth Circuit held that whether or not the oil constituted a slipping hazard was a question of fact, and therefore a question for the jury. Gregory, 32 F.3d at 162-63.
¶16 It is axiomatic that if, in fact, Martin slipped on the ice and snow on the locomotive steps, then the ice and snow were a slipping hazard. However, even assuming Martin established, as he contends, the presence of the ice and snow on the locomotive steps, he did not conclusively establish that the ice and snow caused him to slip. Evidence was presented to the jxuy that the snow and ice on the locomotive steps did not cause Martin to slip. Martin himself testified at trial that he observed only “a little bit” of ice and snow on the steps, and he did not know if it contributed to him slipping on the steps. Martin’s attorney conceded at trial that there was conflicting evidence about ice and snow on the locomotive steps, and that it was a proper jxuy question. Viewed in a light most favorable to BNSF, evidence existed to support the jury’s determination that BNSF was not liable for Martin’s injury due to the presence of ice and snow on the locomotive’s steps. The District Court did not err by allowing Martin’s LIA claim to be considered by the jury.
¶17 2. Whether the District Court abused its discretion by excluding evidence of heated platforms at BNSFs Whitefish and Essex depots.
¶18 At the time of Martin’s injury, the Whitefish platform was not heated. After Martin’s injury, Amtrak used federal stimulus money to install a heated platform at Whitefish. BNSF filed a motion in limine requesting the District Court exclude evidence that the Whitefish platform is now heated, arguing it was inadmissible as a subsequent *429 remedial measure. The District Court granted BNSF’s motion in limine.
¶19 “When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence [or] culpable conduct.” M. R. Evid. 407.
¶20 Martin argues that because the heated platform at Whitefish was installed by Amtrak, M. R. Evid. 407 does not apply, citing Stevens v. Novartis Pharms. Corp., 2010 MT 282,358 Mont. 474, 247 P.3d 244. In Stevens, we held: “M. R. Evid. 407 does not prohibit evidence of subsequent remedial measures taken by non-parties.” Stevens, ¶ 93. In response, BNSF neither substantively addresses nor attempts to distinguish Stevens other than to argue that Stevens “is a different situation” because, in the present case: “[T]he platform in question was BNSF’s platform on BNSF’s property used by BNSF’s employees (the other end of the platform was used by Amtrak).” Assuming for the sake of argument that this contention was sufficient to distinguish our holding in Stevens from this case, BNSF fails to cite to anything in the record in support of its contention. The only evidence in the record regarding ownership of the platform to which we are cited is the representations of BNSFs attorneys during arguments on this motion in limine, in which they represented to the District Court: “tilt’s an AmTrak [sic] platform” and “[I]t was AmTrak [sic] platforms, federal money. AmTrak [sic] was the reason that they got — that they [installed the heated platform].”
¶21 Moreover, irrespective of the ownership of the platform, there does not seem to be any dispute in the record that the act of installing the heated platform at Whitefish was taken by Amtrak and not BNSF.[2] Therefore, if in fact this did constitute a subsequent remedial measure, it was nevertheless a measure taken by a non-party — Amtrak. As Martin correctly noted, we have previously held that “M. R. Evid. 407 does not prohibit evidence of subsequent remedial measures taken by non-parties.” Stevens, ¶ 93. The District Court’s exclusion of evidence of the heated platform at Whitefish as a subsequent remedial measure, *430 therefore, was in error. Because we remand for a new trial on Issue Three, we need not determine whether the exclusion of this evidence prejudiced Martin.
¶22 Martin next argues that the District Court erred when it excluded evidence of the heated platform at the BNSF yard in Essex. The heated platform at Essex would not constitute a subsequent remedial measure because it was already installed at the time of Martin’s injury. Martin argues on appeal that evidence of the Essex platform was admissible to show feasibility of such measures and for impeachment. BNSF responds that the District Court properly excluded evidence of the Essex platform as irrelevant. BNSF further argues that notwithstanding the District Court’s exclusion of this evidence, it advised Martin’s attorney that he was allowed to engage in “fairly rough” cross-examination of BNSFs witnesses on the feasibility of heated platforms, which Martin chose not to do. BNSF therefore argues: “Any error created by the District Court in not allowing evidence of the heated platforms is harmless where, as here, the Court provided Martin an alternate method of gamering the information, and he simply chose not to pursue it.” We agree.
¶23 As it pertains to the Essex platform, we cannot fault the District Court for declining to prospectively rule that evidence of the heated platform at Essex was relevant before it could even assess the context in which the evidence might be offered. As BNSF correctly notes, when addressing the scope of Martin’s cross-examination on the issue of heated platforms, the District Court specifically advised Martin’s counsel that if may be proper grounds for cross-examination to ask “[Cjouldn’t you shovel better? Couldn’t you use salt? Couldn’t you put in a heated platform?(Emphasis added.) The District Court concluded: “Maybe there’s a point where you can’t take it any further, but I kind of let cross-examination be fairly rough.” Although Martin’s attorney conceded that the District Court’s ruling was “fair,” Martin did not engage in any cross-examination of BNSFs witnesses regarding heated platforms. Thus, he did not afford the District Court the opportunity to assess whether he had reached the point where he could not “take it any further.” Martin argued evidence of the heated platform at Essex was admissible to show the feasibiliiy of a heated platform being installed at Whitefish at the time of his injury. The District Court’s ruling recognized that such evidence would only become relevant once BNSF contended such a measure was not feasible. This was the specific line of inquiry the District Court allowed Martin to pursue and which *431 he chose not to do.[3] Under these circumstances, the District Court did not abuse its discretion.
¶24 3. Whether the District Court abused its discretion by admitting into evidence the specific amount of income Martin made from his non-railroad employment.
¶25 Before trial, Martin filed a motion in limine requesting the District Court exclude any references to his outside consulting employment and “[a]ny reference to monies earned by Martin as a consultant with Tim Martin Law Enforcement.” The District Court denied Martin’s motion in limine on this issue.
¶26 Martin argues that the District Court erred by admitting the specific amounts he earned from his non-railroad employment, when the proper measure of his economic loss was what he was earning at BNSF on the date of his injury, citing Adskim v. Or-Wash. R.R. & Nav. Co., 294 P. 605, 610 (Or. 1930) (in an FELA case, the wages plaintiff was receiving at the time of injury is the proper basis upon which to measure the amount of damages he was entitled to recover as lost wages). Martin also argues that he was unfairly prejudiced by the disclosure of the income he made from his consulting business.
¶27 BNSF argues that evidence of Martin’s non-railroad employment was admissible for two reasons: (1) Martin could not have made himself available to work on a train every day while simultaneously working 40 hours per week elsewhere; and (2) Martin had no motivation to make himself available to work every day of the week because he was earning $80,000 to $90,000 per year in his other job. To the extent that there may have been error, BNSF argues that any error was harmless because the evidence of Martin’s non-railroad employment went only to damages and, since the jury did not find BNSF liable for Martin’s injuries, damages were not an issue.
¶28 To the extent that the demands on Martin’s time from his non-railroad employment may have restricted his availability to work the conductors’ extra board, evidence of this nature was admissible. Indeed, in his counsel's colloquy with the District Court on this issue, Martin’s attorney conceded: “If they want to ask him, were you *432 working outside, that’s fine. But to bring up the dollar amount he’s making out there? There’s no reason that has to come in.” Although acknowledging that the evidence of Martin’s non-railroad income was “very prejudicial,” the District Court nevertheless concluded that it was admissible to provide context for the jury.
¶29 Assuming for the sake of argument that Martin’s non-railroad income during the time he was off injured had some limited probative value, BNSFs use of this evidence at trial went far beyond this theoretically limited value. BNSF and Martin stipulated at trial that he was unable to physically perform his railroad duties from January 19,2009 to June 15,2009. Yet during trial, BNSF repeatedly brought up Martin’s outside consulting business and the wages he earned from that business — not just during the months in 2009 when Martin was off injured — but also for the years 2006, 2007, 2008, all of 2009, including the months Martin was not off injured, and 2010. In his opening statement, BNSFs counsel told the jury that, from his consultingbusiness, Martin earned approximately $84,000in2008 (the year before his injury), that he earned almost $90,000 (it was actually $84,060) in 2009 (the year of his injury), and that he earned almost $90,000 in 2010 (the year after his injury). During trial, over Martin’s objections, BNSF introduced invoices that Martin submitted to the Chippewa-Cree Tribe both for his hours worked and his expense reimbursements. The BNSF also introduced, over Martin’s objections, Schedule C from Martin’s 2008,2009, and 2010 tax returns. In closing argument, BNSFs counsel argued to the jury:
I’m not faulting him for having a job that pays him 80 to 90 thousand dollars. But there was no motivation for him to work as heavily as he claims.
¶30 We have previously held that the introduction into evidence of outside sources of income for the purpose of suggesting to the jury that a plaintiff had a motive for not working was so prejudicial as to require reversal. Mydlarz v. Palmer/Duncan Constr. Co., 209 Mont. 325, 682 P.2d 695 (1984); Mickelson v. Mont. Rail Link, 2000 MT 111, 299 Mont. 348, 999 P.2d 985. Although Mydlarz and Mickelson both involved the plaintiffs receipt of workers’ compensation benefits, we cannot reconcile disallowing evidence of wage replacement benefits being offered to show a lack of motivation to work — as we have consistently done in the past — with allowing evidence of wages from separate employment being offered to show a lack of motivation to work, as was done in this case.
¶31 BNSF argues that cases such as Mydlarz and Mickelson are inapposite to the case before us because they involved collateral source *433 payments as opposed to earnings from separate employment. In seeking to distinguish these cases, BNSF contends: “The exclusion of collateral source benefits at trial serves the purpose of encouraging individuals to purchase and maintain liability insurance by eliminating the prejudicial impact of such evidence.” This statement illustrates the infirmity ofBNSF’s argument that Martin’s non-railroad income was admissible. Certainly, encouraging individuals to seek and maintain gain-fill employment serves as important a purpose as encouraging them to draw on a collateral source benefit such as workers’ compensation. It makes little sense, then, that we would exclude evidence of the latter because of its prejudicial impact, but allow evidence of the former.
¶32 M. R. Evid. 403 provides in pertinent part: “Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.” “Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable.” M. R. Evid. 401. It is questionable whether evidence of the amount of money Martin earned at his non-railroad employment — much less the amount he was reimbursed for his expenses — during extended time periods both before and after his irquiy, would have any tendency to make the existence of his wage loss during a discrete five month period in 2009 any more or less probable. Even if we were to assume some relevancy to such evidence, however, as the District Court recognized, this evidence was “very prejudicial.” For similar considerations that we disallowed such evidence in Mydlarz and Mickelson, we conclude it was error to admit it in this case.
¶33 Regarding BNSFs argument that the error was harmless because the jury found BNSF was not hable, we rejected this same argument in Mickelson, in which we recognized “that such evidence can have an impact upon a jury’s verdict on the issue of liability, as well as damages.” Mickelson, ¶ 46. We have held: “The test of prejudicial error requiring reversal is whether there is a reasonable possibility the inadmissible evidence might have contributed to the verdict.” Boude v. Union Pac. R.R. Co., 2012 MT 98, ¶ 21, 365 Mont. 32, 277 P.3d 1221 (quoting Pacificorp v. Dep’t. of Revenue, 254 Mont. 387, 398, 838 P.2d 914, 920 (1992)). In this case, much ofBNSF’s argument to the jury was essentially that, irrespective of his injury, Martin suffered no damage because he had substantial outside income. We cannot say there is not a reasonable possibility the inadmissible evidence of Martin’s non-railroad income contributed to the verdict.
*434 CONCLUSION
¶34 The District Court did not err by allowing the issue of whether the BNSF violated the LIA to go to the jury. The District Court erred by excluding evidence of the installation of the heated platform at Whitefish as a subsequent remedial measure. The District Court did not err by excluding evidence of the heated platform at Essex. The District Court erred by allowing any evidence of Martin’s income and expense reimbursements from his non-railroad employment. This error was not harmless.
¶35 Affirmed in part, reversed in part, and remanded for a new trial consistent with this opinion.
CHIEF JUSTICE McGRATH, JUSTICES COTTER and BAKER concur.

 Martin and the District Court refer to his motion as a “Motion Notwithstanding the Verdict.” Martin made his motion pursuant to M. R. Civ. P. 60, which references a “Motion for Judgment as a Matter of Law.” We therefore refer to Martin’s motion as such in this opinion.

 Although BNSF states in its brief on appeal that “BNSF took part in the construction of its end of the platform,” BNSF again fails to cite any portion of the record in support of this statement. M. R. App. F. 12(l)(f) requires that when presenting an argument, the parties must cite to “the authorities, statutes, and pageB of the record relied on.”

 Martin argues in his reply brief that neither of the two witnesses BNSF called in its case-in-chief could have testified about BNSF’s snow removal policies because that was not their area of responsibility. Martin contends that BNSF’s decision to not call the witness who could testify about snow removal policies precluded any cross-examination on the subject. Because Martin did not ask either of BNSF’s witnesses any questions about snow removal policies, however, we can only speculate that they would have testified that they had no knowledge on the subject.